Lorraine HILL, Plaintiff,

v.

**UNDERWOOD MEMORIAL HOS-PITAL and John Doe(s) Nos. 1–15, Defendants.**

**Civil Action No. 03–2779 (JEI).**

United States District Court, D. New Jersey.

April 20, 2005.

Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and that Plaintiff has no cause of action under state law. Defendant's motion will be granted. Plaintiff's federal claims under the FMLA will be dismissed with prejudice. (Counts I–III, 2d Am. Compl.) Since this Court will no longer have jurisdiction over the Complaint, Plaintiff's state law claims [1] will be dismissed without prejudice, and may be refiled in state court. (Counts IV–V, 2d Am. Compl.)

## I.

Plaintiff Lorraine Hill ("Plaintiff") was employed by Defendant Underwood Memorial Hospital ("UMH") in its Mobile Intensive Care Unit ("MICU") from April, 1990, through June 13, 2001.[2] Key to the instant motions is the timing and length of various leaves of absences requested and taken by Plaintiff.

Plaintiff took a leave of absence from December 16, 1999, through January 1, 2000. (Pl. Stmt. of Undisputed Facts, at ¶ 6.) UMH designated that leave as FMLA leave.[3] By letter dated January 19, 2000, Plaintiff's supervisor, Paul Lambrecht ("Lambrecht"), Director of the MICU, informed Plaintiff that her time off from work could be counted towards available FMLA leave. Plaintiff disputes the designation as FMLA leave, but does not dispute that she in fact took seventeen days of "medical leave." (Id.)

In early August, 2000, Plaintiff requested an intermittent leave due to emotional stress, stemming from the death of her parents. Her request also stated that she needed the time to move into her deceased

Law Offices of Richard E. Yaskin by Richard E. Yaskin, Voorhees, NJ, for Plaintiff.

Crammer & Bishop by Timothy M. Crammer, Abescon, NJ, for Defendant.

## OPINION

IRENAS, Senior District Judge.

Presently before this Court is Defendant's motion for summary judgement and Plaintiff's cross-motion for partial summary judgement. Defendant argues that Plaintiff cannot state a claim under the

1. Plaintiff has withdrawn Counts VI and VII of her Second Amended Complaint.

2. Plaintiff had previously been employed in the MICU from 1976 through 1984. (Compl. at ¶ 7.)

3. It is undisputed that UMH is an "employer" within the meaning of the FMLA. (Pl. Stmt. of Undisputed Facts, at ¶ 4.)

parents' home. (Compl., ¶ 9.) This request was denied in writing by Lambrecht on August 8, 2000. (*Id.* at ¶ 10.) Lambrecht cited staffing shortages and difficulty covering shifts as the basis for his denial.

On or about August 16, 2000, Plaintiff submitted a note from her family doctor, Dr. Reutter, stating that she would not be able to return to work until August 23, 2000. (Pl. Proposed Undisputed Facts, at ¶ 26.) Lambrecht, by letter dated August 18, 2000, requested that Plaintiff have her doctor complete a Certificate of Healthcare Provider, so that UMH could determine if Plaintiff was eligible for leave under the FMLA.

Plaintiff was diagnosed by her doctor with a temporarily disabling Epstein Barr virus. (Compl. at ¶ 11.) The FMLA allows employers to obtain a second medical opinion for employees requesting leave, at the employer's expense. Invoking this FMLA provision, UMH made numerous attempts to arrange a visit for Plaintiff with a UMH-selected doctor. Finally, after multiple missed and canceled appointments, on November, 3, 2000, Plaintiff saw the UMH-selected physician, Dr. Brian Chernoff. (*Id.* at ¶ 13.) Dr. Chernoff submitted an opinion to Lambrecht. Dr. Chernoff's findings basically supported the diagnosis of Epstein Bar virus and Lambrecht approved (after the fact) Plaintiff's FMLA leave. (Pl. Proposed Undisputed Facts, at ¶ 31–32.)

By letter dated November 14, 2000, Lambrecht advised Plaintiff that she must return to work by November 21, 2000.[4] (Compl. at ¶ 14.) Plaintiff complied and returned to work as a paramedic on November 21, 2000. (*Id.* at ¶ 15.) At that time, she had taken 98 days of FMLA leave. (Pl. Stmt. of Undisputed Facts, at ¶ 7.)

On May 18, 2001, Plaintiff was treated by Dr. James Booner in the UMH Emergency Room for an ulcer on the heel of her left foot. (Compl. at ¶ 16.) That same day, Plaintiff went on leave due to her medical problem. (Pl. Stmt. of Undisputed Facts, at ¶ 8.) Dr. Bonner referred Plaintiff to orthopedic specialists, Drs. Hecht and Chao, to treat the ulcer. (Compl. at ¶ 17.) After consulting Dr. Hecht, Plaintiff delivered to Lambrecht sometime in June, 2001, a letter from Dr. Hecht requesting that she be placed on medical leave until approximately September 5, 2001.[5] (*Id.* at ¶ 18.)

On or about June 13, 2001, Plaintiff's employment was terminated. Lambrecht informed her that she could reapply for employment at UMH when she was able to return to work. (Compl. at ¶ 19.)

To treat the ulcer on her left foot, Plaintiff underwent a skin graft surgical procedure on December 10, 2001. (*Id.* at ¶ 20.) At some point in late January or early February, Plaintiff felt that she was ready to return to work.[6] She applied for positions as a paramedic and in the secretarial/clerical pool. (*Id.* at ¶ 22.) Plaintiff did not receive a response from UMH and subsequently re-faxed her application to UMH on February 7, 2002. (*Id.*) At the end of March, 2002, Plaintiff received a letter from Lambrecht in which she was

---

4. In a letter, dated October 30, 2000, Lambrecht advised Plaintiff that she exhausted her twelve week entitlement of FMLA leave as of October 25, 2000. (Ex. P, Def. Mot. For Summ. J.)

5. It appears that Plaintiff stopped coming to work on May 18, 2001, but did not officially request a medical leave of absence and pro-

vide Lambrecht with a physician's certification until June, 2001.

6. Earlier, in December, 2001, Plaintiff had contacted Lambrecht regarding an available position in the MICU. He advised her that she would need to apply as a new applicant. (Compl., at 21.)

informed that her application for a paramedic position in the MICU was denied. She was also told that her application would be kept on file for other positions that may open in the future. (*Id.* at ¶ 23.)

On June 9, 2003, Plaintiff filed her initial complaint claiming: (1) several violations of the FMLA; (2) violations of the New Jersey Law Against Discrimination ("NJLAD"); (3) violation of an implied contract by UMH; and (4) violations of implied covenants of good faith and fair dealing associated with her implied contract.[7]

On January 7, 2005, Defendant moved for summary judgment. Plaintiff filed her opposition and cross-moved for partial summary judgement on February 1, 2005. Defendant opposed Plaintiff's cross-motion.

## II.

The test for summary judgement is stated in Rule 56 of the Federal Rules. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

Defendant argues that Plaintiff cannot state a claim under the FMLA because she did not have any available FMLA leave at the time when she was terminated. Defendant further argues that Plaintiff's state law claims cannot survive summary judgement. Plaintiff has voluntarily withdrawn her claims for breach of an implied contract and violation of an implied covenant of good faith and fair dealing, leaving her claims under the NJLAD as her only state law claims. (Pl. Mem. at 29.)

### A.

The FMLA aims to "balance the demands of the workplace with the needs of families" by allowing employees to take up to twelve weeks of leave for certain medical reasons in a twelve month period. 29 U.S.C. §§ 2601(b)(1),(2); 2612(a)(1)(D). In essence, the FMLA requires an employer to "hold" an employee's position while she is on leave, or to provide that employee with an equivalent position when she returns. Employers are prohibited from interfering or restraining an employee's right to leave; an employee has a right of action against employers who do interfere with, restrain, or deny the right to FMLA leave. §§ 2615(a); 2617. If an employer terminates an employee for requesting or taking leave, it would constitute interference with the FMLA. In addition, an employer may not consider past FMLA leave requested or taken in hiring decisions. 29 C.F.R. § 825.220(b),(c).

### 1.

The FMLA allows employers some flexibility in how they calculate the twelve-

---

**7.** Plaintiff filed her First Amended Complaint on July 10, 2003, and a Second Amended Complaint on September 5, 2003. Both

Amended Complaints contained similar allegations to the original complaint.

month period in which an employee may take FMLA leave. An employer may choose between four options: (1) the calendar year; (2) any fixed "leave year," such as a fiscal year, a time period set by state law, or a year that renews on the employee's anniversary date (i.e. the date the employee was hired or deemed a permanent employee); (3) a twelve month period counting forward from an employee's first day of leave taken; or (4) "[a] 'rolling' 12-month period measured backward from the date an employee uses any FMLA leave." 29 C.F.R. § 825.200(b).

The "rolling" twelve-month period method, one of the accepted methods, measures the twelve-month period backward from the date on which an employee uses any FMLA leave. 29 C.F.R. § 825.200(b)(4).[8] UMH asserts that it operates under the rolling twelve-month period method.

An employer's choice of calculation method is constrained by the limits found in 29 C.F.R. § 825.200. For example, once a method is selected, it must be applied equally to all employees. 29 C.F.R. § 825.200(d)(1). Also, if an employer fails to select a method, the method "that provides the most beneficial outcome for the employee will be used." § 825.200(e).

In *Bachelder v. America West Airlines, Inc.*, the Ninth Circuit found that while the regulations provide employers with the flexibility to choose an option, "they do not specifically state how an employer indicates its choice." 259 F.3d 1112, 1127 (9th Cir.2001). The Ninth Circuit interpreted the regulations to "plainly contemplate that the employer's selection of one of the four calculation methods will be an open one, not a secret kept from the employees."[9] *Id.*

The Ninth Circuit further examined whether the defendant, America West, had in fact provided adequate notice of its chosen method to its employees, and specifically the plaintiff in the case. During the relevant period of time, the America West employee handbook included a generic statement regarding FMLA leave: "employees are entitled to up to twelve calendar weeks of unpaid [FMLA] leave within any twelve month period." *Id.* at 1129. The Ninth Circuit found that America West's language merely parroted the statute and did not indicate that the rolling method would be utilized.

In *Bachelder*, the employee handbook was the only written communication between America West and its employees regarding FMLA leave. Thus, there was little opportunity, if any, for an employee to discover which calculation method America West utilized. By keeping that information out of the employee's reach, it was concealed and not open. Since the calendar method offered "the most favorable outcome" to the plaintiff, the Ninth Circuit applied that method and found that the plaintiff's absences were covered by the FMLA. *Id.*

The concept of adequate notice with regard to an employer's selected calculation method is discussed in only two other published opinions, both from district courts

---

8. Under the rolling method, "each time an employee takes FMLA leave the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months. For example, if an employee has taken eight weeks of leave during the past 12 months, an additional four weeks of leave could be taken." 29 C.F.R. § 825.200(c).

9. The regulations require that specific notice be given when an employer changes its choice, but are silent as to how the employer should give notice, if at all, of its initial choice. *See* 29 C.F.R. § 825.200(e); 259 F.3d at 1127–28.

outside the Third Circuit. In *Dodaro v. Village of Glendale Heights*, the Northern District of Illinois adopted the Ninth Circuit's ruling in *Bachelder*. No. 01–6396, 2003 WL 1720030 (N.D.Ill. Mar.31, 2003). The employer in *Dodaro* had distributed an "Employee Manual and Personnel Policy Manual" in which general reference to the FMLA was made. *Id.* at *7. These manuals did not indicate which calculation method was utilized. However, the employer provided the employees with other written documents, which did include express statements of the employer's election of the rolling method. After reviewing the regulations, the district court determined that the employer was required to include an express statement regarding its choice of a calculation method in its employee handbook or policy manual. *Id.* at *7.

In *Phillips v. Leroy–Somer North America,* the Western District of Tennessee granted summary judgement in favor of an employer. No. 01–1046–T, 2003 WL 1790941, at *5 (W.D.Tenn. Mar.28, 2003). The district court reached its decision after reviewing the Ninth Circuit's opinion in *Bachelder* and the relevant regulations. Specifically, the district court noted that "Section 825.301(a)(1) states merely that, if written material regarding benefits are given to employees, such as an employee handbook, those materials must contain 'information on FMLA rights and responsibilities and the employer's policies regarding the FMLA.'" *Id.* The district court expressly disagreed with the Ninth Circuit's conclusion that section 825.301(a)(1) requires specific notice with regard to the chosen calculation method. The court focused on the fact that there

was no evidence that the employer " 'concealed' its method of calculating the FMLA leave year, or kept it a 'secret' from its employees." *Id.* The district court also found that, regardless of the calculation method, the plaintiff was not prejudiced because she did not "mistakenly believe[ ]" that she was entitled to additional leave and because there was no evidence that she "would have, or could have, returned to work any sooner than she did." *Id.*

2.

Plaintiff does not dispute that she was absent from work from August 16, 2000, through November 21, 2000, due to a medical problem, namely the Epstein Barr virus.[10] This period amounted to 98 days of leave.[11] It is also undisputed that on May 18, 2001, Plaintiff went on leave due to a medical problem with her foot. A note from her doctor, dated June 5, 2001, indicated that she would be unable to return to work until after September 5, 2001. Plaintiff does not dispute that UMH contacted her on June 13, 2001, and advised her that she did not have any remaining FMLA leave, although she does dispute UMH's calculation.

Plaintiff's opposition and cross-motion focus on the legitimacy of UMH's calculation of the FMLA twelve-month period, specifically its use of the rolling twelve-month period method. Plaintiff contends UMH did not notify her of its calculation method prior to her taking leave in August, 2000. In fact, Plaintiff claims that when she requested an additional leave in May/June of 2001, she believed that she was entitled to it, as she thought a new

---

**10.** For the purposes of their motion, Defendants accept that Plaintiff's absence was due to a "serious health condition." (Def. Mot., at 9 n. 2.)

**11.** It is also undisputed that Plaintiff had previously taken seventeen days of leave, from

December 16, 1999, through January 1, 2000. Plaintiff does dispute Defendant's contention that the seventeen days counted towards her available FMLA leave, because UMH did not inform her that her medical leave was covered under the FMLA until January 19, 2000—after the leave was taken.

twelve week leave option was available after her anniversary date, in February, 2001.

Plaintiff cites to numerous employee manuals and contends that no manual issued prior to December, 2000, indicated that UMH had opted to utilize the rolling method.[12] Plaintiff also points to a letter she received from Lambrecht, dated January 19, 2000, following her seventeen day leave (from December 16, 1999, to January 1, 2000); this letter did not indicate that the rolling method was being utilized and only indicated that her time off could be characterized as FMLA leave. (Ex. C, Def. Mot. For Summ. J.)

■ Plaintiff's arguments do not meet the threshold to survive summary judgment. UMH was within its rights in utilizing the rolling method. The federal regulations are clear in allowing employers flexibility in choosing a calculation method. While the Third Circuit has not spoken on the issue of notice addressed in *Bachelder*, based on the evidence before the Court, as a matter of law, UMH provided adequate notice with regards to its selection.

The documents provided by Plaintiff herself demonstrate that from 1998 forward numerous policy statements included information regarding the rolling twelve-month period method. While we accept as true Plaintiff's claim that the FMLA calculation method and the term "rolling" did not appear in an official employee manual until December, 2000, the UMH FMLA policy was published in the Personnel Policy Manual, as Policy Number 331,[13] and was made available for employee review through other means. Mr. Manestrina, a

---

**12.** Plaintiff attaches two employee handbooks, which she asserts were in effect prior to 1999, and which did not include any references to a rolling twelve-month period. An employee handbook, dated 7/97, and listed as "revised November 1994," defines a leave of absence as "time away from work, with permission, for more than two weeks." (Ex. D, marked as P–6.) It also states that "[f]ailure to request a leave of absence or return on schedule from an approved leave or extension will be considered a resignation without notice." (*Id.*) Specifically with regard to medical leaves of absence, an employee was required to provide a physician's note that specified the date when the leave would commence, the nature of the illness, and the date when the employee could return. (*Id.*) Another employee handbook, with a handwritten notation that it was "prior to Nov. 1994," contains similar language. (Ex. D, marked as P–7.) Neither mention a rolling twelve-month period, and in fact, neither even reference the FMLA.

An employee handbook, dated December, 2000, contains the following statement "You may be granted up to twelve weeks of unpaid leave time during a rolling twelve-month period for MLA ... beginning on the first day of absence...." (Ex. C.) Plaintiff contends that the December 2000 Manual was the first time that employees were made aware of the rolling year method of calculation.

**13.** Policy Number 331, titled Family and Medical Leave, is provided by Plaintiff at Exs. E and F, in different versions. The early version contains a handwritten note indicated that it is "Former Policy–1998." (Ex. E, marked P–3.) This policy states that "Employees may be granted up to twelve (12) weeks of unpaid leave time during a rolling twelve (12) month period, beginning on the first day of absence [for assorted medical reasons]." The policy also states that additional leave, up to nine months, *may* be granted on a *conditional basis.* (*Id.*) A later version of Policy Number 331 provides an issue date of October, 1996, and a revised date of December, 1999. The 1999 policy states, like the 1998 policy, that twelve weeks of leave are available "during a rolling twelve (12) month period for FMLA." In addition, the 1999 policy provides for extended medical leave time, again on a conditional basis, *"for a period of up to six (6) months, inclusive of FMLA time off."* (*Id.*) (emphasis in the original.) In August 2000, Policy Number 331 was revised again. It included the same language on FMLA leave calculations based on a rolling twelve-month period, but completely omitted the language regarding the possibility for extended leave. (Ex. F.)

UMH employee, testified at his deposition that the policies were "part of the human resource policy and procedure manual which was at all the director levels. We posted the FMLA policy in the human resource office and at employee bulletin boards throughout the hospital. We talked about FMLA at directors meetings. Directors take that information and talk to staff at staff meetings." (Manestrina Dep., at p. 59, Ex. B, Def. Mot. For Summ. J.) Plaintiff was not restricted from learning about her rights under the FMLA; the polices were written, located in a permanent manual and openly available.[14]

In addition, prior to Plaintiff requesting leave in May/June of 2001, and before her anniversary date in February, 2001 (at which point she claims she thought her leave year would renew), Plaintiff was on notice that UMH utilized the rolling year method. Plaintiff is correct that Lambrecht's letter, dated January 19, 2000, which followed her seventeen days of leave, did not advise her of the method utilized by UMH. She was put on notice, however, by one of the numerous letters sent to her regarding her extensive leave taken from August to November of 2000.

In a letter dated October 30, 2000, Lambrecht stated, "I am also advising you that, even if FMLA time is approved for this absence, you have exhausted your twelve-week FMLA entitlement as of October 25, 2000, since you had a prior leave within the last twelve months that was applied to your FMLA entitlement." (Ex. P, Def. Mot. For Summ. J.)

Moreover, the December 2000 Employee Manual was issued and distributed more than four months prior to Plaintiff's foot injury, and over a month before her anniversary date. The December, 2000, manual explicitly states that the rolling method was utilized by UMH. In conjunction with the numerous policy statements, posters, and discussions, the October 30, 2000 letter and the December 2000 Manual put Plaintiff on notice that her leave would not be renewed on her anniversary date in February, 2001.

Accepting Plaintiff's recitation of the facts as true, there remains no indication that the UMH policy was concealed or kept secret from its employees. There was adequate notice of UMH's selected method of calculating the FMLA twelve-month period.[15]

---

**14.** Plaintiff stated that while she believed that twelve weeks of available FMLA leave renewed in February, 2001, she did not attempt to contact anyone about her FMLA rights, even after Lambrecht told her in May, 2001, that she was not eligible for such leave. (Hill Dep., at p. 176, Ex. I, Pl. Mem.) In her deposition, Plaintiff made vague accusations that "they all stick together" and would treat her unfairly. (*Id.*) Plaintiff's speculation that Lambrecht, and everyone else at UMH, would not answer a question about eligible leave does not raise an issue of material fact as to whether UMH's FMLA policy was open and available.

**15.** Our decision does not stand in contrast with the holding in *Dodaro,* despite the fact that there was no reference to the calculation method in the governing employee handbook as of August, 2000. The district court in

*Dodaro* appeared to hold that notice would be adequate if the calculation method was found in a policy manual or other "permanent written document," but not the actual "employee handbook." 2003 WL 1720030, at *7. The district court suggested that a "one time, stand-alone" type document could not provide notice, because "an employee would be less likely to recall and/or be able to locate the copy." *Id.* In this case, the written policies did specifically state that the rolling method was utilized. The evidence shows that directors and managers had the policy manual in their offices, and its contents were available to employees. To the extent that the UMH's written policies constitute a "policy manual," our holding today is consistent with *Dodaro.*

While an employee must be given some indication of what calculation method gov-

Furthermore, even were this Court to find that another method applied, Plaintiff still would not be entitled to relief. After taking more than twelve weeks leave in August–November of 2000, Plaintiff requested another leave of absence in June, 2001. She asked to be placed on leave from May 18, 2001 to September 5, 2001. (Pl. Stmt. of Undisputed Facts, at ¶ 8.) The leave requested at the time she was discharged covered more time than. the twelve weeks permitted under the FMLA. In fact, it was not until early 2002,[16] that she felt that her foot problem had resolved adequately so that she could apply for new employment with UMH. (*Id.* at ¶ 11.)

■ Even had Plaintiff been justified and correct in assuming that the twelve month period renewed in February, 2001, she still would not have been eligible for the almost seventeen weeks of leave she requested. Plaintiff's position here differs from that of the plaintiff in *Phillips*, in that she has asserted that she "mistakenly believed" that she would be entitled to an additional twelve weeks, where the plaintiff in *Phillips* was not operating under a mistaken belief. However, as in *Phillips*, Plaintiff was not prejudiced. If UMH had granted Plaintiff a twelve week leave of absence, the evidence shows that Plaintiff still would not, and could not, have returned to work within that twelve week period.[17] Thus, even if UMH's notice was inadequate, Plaintiff has not established that she suffered prejudice due to the lack of notice and cannot assert a claim. *Cf. Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 122 S.Ct. 1155, 1161, 152 L.Ed.2d 167 (2002) (holding that a plaintiff must have been prejudiced by an alleged violation of the FMLA in order to seek relief).

UMH's denial of additional leave and termination of Plaintiff's employment in June, 2001 was not in retaliation for Plaintiff taking leave months before[18] or requesting leave in May, 2001. UMH's decisions do not constitute "interference" with Plaintiff's rights under the FMLA, as her

---

erns so that she can make efforts to comply, we are not inclined to adhere to a rigid requirement that the calculation method be articulated specifically in the employee handbook, especially in light of the numerous other means by which employers communicate policies and procedures to their employees.

16. Plaintiff contends that it was on January 31, 2002, that she first applied for a position at UMH as a secretary or a paramedic. (Pl. Stmt. of Undisputed Facts, at ¶ 11.)

17. This is not a case where an employee has some flexibility with regard to when she takes FMLA leave. For example, an employee who needs to provide care for a family member may be able to arrange her schedule based on the calculation method her employer has chosen; she could put off taking leave or stagger her leave accordingly. In the instant case, Plaintiff suffered from a disability that forced her to remain out of work for a period of time beyond the protected twelve weeks of leave on at least two occasions. Plaintiff would not have been able to choose when she took leave, regardless of the calculation method utilized, and regardless of whether she fully understood how available leave was calculated.

18. Plaintiff claims that she was fired in retaliation for taking leave. Plaintiff offers as evidence of retaliation a comment by Lambrecht to outside labor counsel in which Lambrecht stated that the timing of Plaintiff's leave in August, 2000 was "more than coincidental" because it was close in time to her denied request for time off. Plaintiff's claim is misplaced; her employment was terminated when she had missed almost a full month of work in May and June 2001—and not after she returned from her extended leave in November, 2000. Furthermore, even utilizing a different calculation method and one most beneficial to her, Plaintiff took far more than the allowed FMLA leave. Plaintiff does not dispute any of the dates discussed; she has not raised any dispute of material fact or law on this claim.

right to twelve weeks of leave was not available at the time of her termination under the rolling method. Even if twelve weeks of leave were available under some other calculation method, Plaintiff was disabled and could not work for more than eight months—May 18, 2001 through January 31, 2002—and would not have satisfied the twelve week limitation.

### 3.

■ Plaintiff argues that an additional nine month leave period was available to her, as it was UMH's practice in the past to offer additional leave time on a discretionary basis. Plaintiff contends that the denial of that leave somehow violated her rights under the FMLA.

UMH has acknowledged that it changed its policy in late 2000 to no longer allow the additional period of extended leave. (Manestrina Dep., at pp. 24, 66.) Plaintiff does not fully articulate how the extended leave falls under her FMLA claim. The FMLA does not require that additional extended leave be made available. Her argument is not grounded in, and is without merit under, federal law.[19] We make no finding as to the viability under state law, although we note that Plaintiff has withdrawn her breach of implied contract and implied covenant claims under state law.

### 4.

■ Finally, Plaintiff has argued that she was not re-hired when she re-applied in January/February 2002 in "retaliation" for taking FMLA leave. Her requested leave, commencing in May, 2001, was not FMLA leave, and thus cannot serve as a basis for a claim under the FMLA. Even were she eligible for some amount, if not the full twelve weeks, of FMLA leave in May, 2001, Plaintiff has not raised a material issue of fact showing that UMH's decision to not rehire her as a paramedic was related to the exercise of her rights under the FMLA, particularly since her inability to work extended for some eight months, far beyond the twelve week maximum provided by the FMLA.

Indeed, UMH noted, and Plaintiff has not denied, that Plaintiff's absenteeism was not only due to FMLA leave. She was often absent beyond her scheduled, requested leaves for extended periods of time. Plaintiff provides evidence that she was commended for her good work as a paramedic, but also admits that her absenteeism, beyond taking leave, was an issue.[20] Plaintiff's bald assertions that Lambrecht was acting in retaliation are insufficient to survive summary judgement.

---

**19.** Furthermore, even if UMH continued to allow additional leave, such extended leave would be granted to follow the initial leave and presumably would be based on the same or a related medical condition. It was not listed as stand-alone additional leave, but rather "extended" leave that could supplement the standard leave. Plaintiff would not have been able to request the additional discretionary leave six months after she returned from an FMLA leave based on a different medical condition.

**20.** Plaintiff's memorandum of law outlines her performance evaluations. On a scale of one (lowest) to six (highest), with three being

an average score, Plaintiff received a "three" on every review for "Attendance and Reliability," from March, 1993, to March, 1997. From March, 1997, to March, 1999, Plaintiff received both two's and three's. During his deposition, Lambrecht read from Plaintiff's employee evaluations. He noted that she received satisfactory scores, but commented that on at least one review her excessive "calling out" was noted as a problem. Plaintiff's reliance on her average or mediocre performance reports as evidence that Lambrecht was acting in retaliation against her because she exercised her rights under the FMLA is misplaced.

## B.

The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, and will dismiss those counts without prejudice to refile in state court, pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

## IV.

For the reasons set forth above, the Court will grant Defendant's motion for summary judgment with regard to Plaintiff's federal claims, dismiss Plaintiff's state law claims without prejudice, and deny Plaintiff's cross-motion.